UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BMO HARRIS BANK N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-03263-SEB-TAB |
| | ) | |
| SALIN BANK AND TRUST COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

On October 23, 2018, Plaintiff BMO Harris Bank N.A. ("BMO Harris") initiated this lawsuit asserting common law claims for unjust enrichment, conversion, and replevin.[1] [Dkt. 1]. Defendant Salin Bank and Trust Company ("Salin") filed its answer on November 16, 2018. Now before us is Salin's Motion for Judgment on the Pleadings, pursuant to Federal Rule of Civil Procedure 12(c). [Dkt. 23]. For the reasons set forth herein, we **DENY** Salin's Motion for Judgment on the Pleadings.

**Factual Background**

BMO Harris's Complaint is based on the following alleged facts, taken as true for the purposes of this Order.

BMO Harris, a national banking organization, executed a construction loan agreement with its customer, North & Maple, LLC ("North & Maple"), for a construction

---

[1] Plaintiff's Complaint invokes our diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332

1

project, on which Midwest Form Constructors, LLC ("Midwest") served as the general contractor. Compl. ¶¶ 6-7. Midwest maintained a bank account and borrowing relationship with Defendant Salin. *Id.* ¶ 8. BMO Harris repeatedly funded advances from its construction loan with North & Maple, directing the advances to Midwest's account at Salin for the benefit of North & Maple. The advances were to be used for the completion of North & Maple's construction project; they were not furnished for Midwest's individual benefits, debts, or obligations. *Id.* ¶¶ 9-10.

On March 12, 2018, Midwest and North & Maple notified BMO Harris that it was not to advance further loan proceeds to Midwest. Instead, BMO Harris was instructed to transfer all future proceeds to the agent of Midwest's bonding company, Atlas Funds Control, LLC ("Atlas") at a different bank. *Id.* ¶ 12. Consistent with this directive, on March 21, 2018, BMO Harris received directions from North & Maple to wire loan proceeds in the amount of $1,199.443.07 to Atlas. BMO initiated the wire transfer in the requested amount on March 23, 2018; however, it mistakenly wired the funds to Midwest's account at Salin. *Id.* ¶¶ 13-14.

That same day, Salin accepted the wire transfer and credited the funds into Midwest's bank account. *Id.* ¶ 15. Salin then withdrew $1.2 million from Midwest's account with the intent of applying the money as a credit on a loan between Midwest and Salin. *Id.* ¶ 18. Prior to Salin's completion of this set off, however, BMO Harris issued a recall request to Salin notifying Salin of the mistake and demanding that Salin return the improperly transferred funds to BMO Harris. Salin did not return the funds, instead completing its set off. *Id.* ¶¶ 19-20, 23.

2

Prior to the mistaken wire transfer, Salin knew Midwest was experiencing financial problems. *Id.* ¶ 11. Additionally, at the time it accepted the wire transfer, Salin knew or should have known that the transfer had to have been committed mistakenly because no significant deposits were expected as a consequence of Midwest's deteriorating financial condition. *Id.* ¶¶ 16-17. Salin nonetheless completed its set off of the transferred funds with the actual and/or constructive knowledge that the wire transfer was completed in error. *Id.* ¶ 18.

## Analysis

### I. Standard of Review

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment after the pleadings are closed, but early enough not to delay trial. We review motions for judgment on the pleadings under the same standard by which we review motions to dismiss for failure to state a claim under Rule 12(b)(6). *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). To survive a motion for judgment on the pleadings, "a complaint must state a claim to relief that is plausible on its face." *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 397 (7th Cir. 2018). At minimum, a plaintiff is required to support its complaint with some specific facts. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In determining the sufficiency of a claim under this standard, the court considers all allegations in the nonmovant's pleading to be true and draws such reasonable inferences as required in the nonmovant's favor. *Jacobs v. City of Chi.*, 215 F.3d 758, 765 (7th Cir. 2000).

## II. Discussion

Salin moves for judgment as a matter of law on the grounds that Article 4A of Indiana's Uniform Commercial Code (the "UCC") provides the exclusive source of rights and remedies for all financial institutions participating in the nation's wire transfer system. Because BMO Harris does not plead a claim under the UCC, Salin argues that BMO Harris's complaint must be dismissed. BMO Harris disagrees, asserting that, while Article 4A governs wire transfers generally, it does not provide the exclusive governing body of law for common law claims so long as they are not inconsistent with the provisions of Article 4A. Specifically, BMO Harris asserts that Article 4A is silent with respect to claims based on a theory that a beneficiary bank accepted funds with the actual or constructive knowledge that the transfer was done in error. In reply, Salin reiterates its contention that Article 4A preempts any and all common law claims related to the disputed wire transfer. It additionally asserts that if Article 4A does not exclusively govern this dispute, BMO Harris has not plausibly alleged that Salin "knew or should have known" the transfer was completed erroneously.

Before turning to the parties' respective arguments, we shall briefly review the statutory scheme which provides the relevant backdrop to the parties' dispute, that is, Article 4A of the UCC as enacted by Indiana. Ind. Code §§ 26-1-4.1-101 *et seq.*[2] Article

---

[2] It appears undisputed that the wire transfer was sent via the Federal Reserve Wire Transfer Network ("Fedwire"), which is operated by the Federal Reserve Bank. Accordingly, the provisions of Federal Reserve Board Regulation J, 21 C.F.R. § 210, are applicable here. In relevant part, Regulation J directs us to apply the applicable state's provisions of Article 4A to funds transfers handled via Fedwire. *Cmty. Bank, FSB v. Stevens Fin. Corp.*, 966 F. Supp. 775, 780, 1997 WL 324451 (N.D. Ind. 1997). We note that Salin conclusively argues that BMO

4A, as recognized in its Official Commentary,[3] generally governs financial institutions participating in the modern funds transfer system. As explained therein:

> A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risk and establish limits on liability, rather than to rely on broadly stated, flexible principles; and Funds transfers involve competing interests—those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

Official Comment to § 4A-102.

Article 4A defines a "funds transfer" as:

> [T]he series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order.

---

Harris's common law claims must also be dismissed "to the extent they are preempted, duplicative, or inconsistent with Federal Reserve Board Regulation J." However, Salin does not explain how Regulation J provides any broader protections in these circumstances than those provided to it in Article 4A.

[3] Although Indiana did not adopt the Official Comments to the UCC as part of the 2007 revisions to its version of the UCC, Indiana courts often look to the Official Comments to the UCC for guidance in applying and interpreting Indiana's version of the UCC. *EngineAir, Inc. v. Centra Credit Union*, 107 N.E.3d 1061, 1067 (Ind. Ct. App. 2018). *See also Collins v. Pfizer*, 2009 WL 126913, *2 (S.D. Ind. Jan. 20, 2009) ("In general, Indiana courts treat the official comments as an authoritative guide to the UCC."); *In re Scott*, 427 B.R. 123, 71 U.C.C. Rep. Serv. 2d 314 (Bankr. S.D. Ind. 2010) (discussing persuasive authority of Official Comments to UCC notwithstanding that Indiana did not adopt them as part of its version of the UCC).

Ind. Code. § 26-1-4.1-104(a). The parties agree that, when the disputed wire transfer occurred, BMO Harris's customer, North & Maple, was both a "sender" and "originator," BMO Harris was the "originator's bank," Salin was both the "beneficiary's bank" and the "receiving bank," and Midwest was the "beneficiary." [Dkt. 23, at 8; Dkt. 30, at 4]. The parties further agree that the wire transfer, although issued mistakenly, was an "authorized order" pursuant to Article 4A,[4] [Dkt. 30, at 14], which was accepted when Salin credited the funds to Midwest's bank account on March 23, 2018. Their agreement ends there.

Pursuant to these undisputed conditions, Salin argues that Article 4A provides the exclusive governing law for its rights and responsibilities upon acceptance of the funds. Specifically, Salin asserts that Section 211 of Article 4A provides the rules and remedies for a financial institution who mistakenly wire transfers money to another. Section 211 provides, in relevant part:

(a) A communication of the sender of a payment order canceling or amending the order may be transmitted to the receiving bank orally, electronically, or in writing[.]

(b) Subject to subsection (a), a communication by the sender canceling or amending a payment order is effective to cancel or amend the order if notice of the communication is received at a time and in a manner affording the receiving bank a reasonable opportunity to act on the communication before the bank accepts the payment order.

---

[4] Whether an order is authorized depends on if the sender (North & Maple) approved the payment order, not whether the originator's bank (BMO Harris) properly followed instructions. Ind. Code § 26-1-4.1-202; *Cmty. Bank, FSB v. Stevens Fin. Corp.*, 966 F. Supp. 775, 782, 1997 WL 324451 (N.D. Ind. 1997)

6

> (c) After a payment order has been accepted, cancellation or amendment of the order is not effective unless the receiving bank agrees or a funds-transfer system rule allows cancellation or amendment without agreement of the bank.

Ind. Code § 26-1-4.1-211. Thus, says Salin, Section 211 provides the mechanisms by which the issuing bank may seek to recover the transferred funds. Pursuant to § 211(b), a recall notice such as the one issued by BMO Harris binds the receiving bank only if it is received *before* the receiving bank's acceptance of the transferred funds. Here, it is uncontested that Salin accepted the wire transfer prior to receiving the recall notice. In such circumstances, § 211(c) delineates three instances when the funds may still be recoverable "because of a mistake by sender" absent the receiving bank's consent to refund, none of which instances is applicable here.[5] Additionally, Article 4A expressly permits Salin to credit the accepted funds against the debts owed to it by Midwest. Ind. Code § 26-1-4.1-502(c). Accordingly, Salin contends that Article 4A explicitly contemplates mistaken wire transfers and provides for Salin to retain the funds, consequently prohibiting the inconsistent and duplicative common law remedies sought by BMO Harris.

---

[5] The funds are recoverable if a mistake resulted in the issuance of a payment order: "(i) that is a duplicate of a payment order previously issued by the sender; (ii) that orders payment to a beneficiary not entitled to receive payment from the originator; or (iii) that orders payment in an amount greater than the amount the beneficiary was entitled to receive from the originator. If the payment order is canceled or amended, the beneficiary's bank is entitled to recover from the beneficiary any amount paid to the beneficiary to the extent allowed by the law governing mistake and restitution. It is uncontested that none of these provisions apply."

In response to these averments, BMO Harris argues that Article 4A does not address whether Salin is entitled to the funds if it knew or should have known of BMO Harris's error prior to the completion of its set off. In contradicting Salin's arguments, BMO Harris asserts that courts nationally have recognized that "not all common law claims are per se inconsistent" with the UCC. [Dkt. 30, at 5] (*citing Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 597 F.3d 84, 89 (2d Cir. 2010)). In particular, BMO Harris asserts that, in factual circumstances such as the ones presented here, several courts have permitted common law claims to move forward because Article 4A does not "expressly address the transfer of funds to an intended beneficiary but to an account at the wrong bank," where the bank "learned of the mistaken transfer prior to its set off of the funds." *Id.* at 7.

Like courts before us who have had to decide whether and to what extent Article 4A preempts common law claims, we recognize the relatively limited body of case law available to guide these decisions. *See Consorcio Indus. de Construccion Titanes, S.A. de C.V. v. Wells Fargo Bank, N.A.,* No. 3:10-cv-2111, 2012 WL 13019678, at *2 (N.D. Tex. July 12, 2012); *Cmty. Bank, FSB v. Stevens Fin. Corp*., 966 F. Supp. 775, 780 (N.D. Ind. 1997). Nevertheless we find guidance in the general principles put forth by those courts, both inside and outside our Circuit, whose decisions preceded ours. Before turning to the specific factual circumstances presented in BMO Harris's Complaint, we shall layout these principles, which based on our analysis we find to be consistent with the provisions and purposes of Article 4A.

As the Southern District of New York explained, "[P]arties whose conflict arises out of a funds transfer should look first and foremost to Article 4A for guidance in bringing and resolving their claims[.]" *Sheerbonnet, Ltd. v. Am. Exp. Bank, Ltd.*, 951 F. Supp. 403, 407 (S.D.N.Y. 1995), *as amended* (May 1, 1996). If a situation is unequivocally covered by particular provisions in Article 4A, then it is beyond debate that Article 4A governs exclusively. *See id.*; *Fitts v. AmSouth Bank*, 917 So. 2d 818, 824 (Ala. 2005). However, courts should not interpret this directive to mean that Article 4A has "completely eclipsed" the applicability of common law in the area of funds transfers. *Sheerbonnet*, 951 F. Supp. At 407 (Article 4A "does not establish a legislative intent to preclude any and all funds transfer actions not based on Article 4A"); *Regions Bank v. Provident Bank, Inc*., 345 F.3d 1267, 1275 (11th Cir. 2003) (holding that Article 4A did not preempt common law claim when the UCC was "silent" as to the factual scenario alleged); *see also Cmty. Bank*, 966 F. Supp. at 788 (quoting *Sheerbonnet* with approval). Rather, preemption likely does not foreclose common law claims related to funds transfers when the disputed "conduct or factual scenario is not addressed squarely by the provisions of [Article 4A]." *Consorcio*, 2012 WL 13019678, at *3; *Regions*, 345 F. 3d at 1275.

The standards espoused in these cases accurately reflect the legislative intent of Article 4A such that Article 4A clearly does place restraints on plaintiffs like BMO Harris but only when they resort to principles of law or equity outside of Article 4A to establish rights, duties, or liabilities that are plainly contemplated by, and thus

inconsistent with, the provisions therein. Accordingly, we reject Salin's contention that Article 4A "provides the exclusive source of rights and remedies for all financial institution participations in the nation's wire transfer system," no matter the factual circumstances.[6] Instead, in deciding whether BMO Harris's common law claims are preempted by the U.C.C., we must determine whether the allegations in the Complaint are "squarely" contemplated by Article 4A. *Consorcio*, 2012 WL 13019678, at *3.

Salin directs us to the holding in *Community Bank FSB v. Financial Corp.* in support of its stance that the current situation is covered, and thus exclusively governed, by Article 4A. F. Supp. 775, 780, 1997 WL 324451 (N.D. Ind. 1997). While we agree that *Community Bank* is useful in dissecting the issue presented here, Salin's reading of that decisions stops short of addressing the Court's full analysis.

In *Community Bank*, a lending company, Homeside, purchased a mortgage from the Stevens Financial Corporation ("Stevens"). Homeside was directed to wire transfer funds to Stevens's bank account. Homeside had previously wired transfers to Stevens's account at Community Bank. However, on this occasion, Homeside was directed to send the funds to a different bank. Homeside completed the transfer, but mistakenly transferred the funds to Community Bank. Community Bank, who was owed a debt by

---

[6] Even cases cited by Salin do not support the proposition that Article 4A is all-encompassing without exception. *See Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 103 (2d Cir. 1998) (citing *Sheerbonnet* affirmatively); *see also Fitts v. AmSouth Bank*, 917 So. 2d at 824 (holding that common law claims were preempted where they were "unequivocally addressed in [] particular provisions of Article 4A").

Stevens, accepted the funds and set off a portion of the wired funds toward the debt. Following the setoff, Homeside informed Community Bank of its error and requested the return of the funds. Although Community Bank returned part of the funds, it refused to return the portion it had set off to eliminate Stevens's debt. Homeside sought recovery of the funds, alleging unjust enrichment. The court rejected Homeside's common law claim, concluding that Community Bank acted properly pursuant to Article 4A, which preempted the claim for unjust enrichment.

Salin would prefer that we dive no deeper than this in relying on the *Community Bank* opinion, citing only the portions of the case that seemingly support Salin's rights to the funds, without looking beyond the language of Article 4A. A careful reading of the case, however, makes clear that our case and the *Community Bank* case do not present "essentially identical circumstances," as Salin argues. Of particular concern, Salin ignores the portion of the *Community Bank* holding that relied on the defendant's lack of knowledge when it took its complained-of actions. In determining that Article 4A exclusively governed the dispute and permitted the defendant's actions, the court stated:

> At the time of the transfer, there was no way for Community Bank to know that the payment order was sent in error or that Homeside was instructed to send the payment to a different warehouse lender . . . [B]ecause . . . Community Bank properly followed the [payment order] without knowledge of any mistake, Community Bank is "free and clear" to collect on Stevens Financial's debt through the set off . . . Accordingly . . . the court finds that the wire transfer sent by Homeside to Community Bank was an authorized payment order that was properly accepted under Article 4A. In addition, the court finds that upon acceptance of the wire transfer, Community Bank was within its rights under Article 4A to set off the funds credits to Steven Financial's [*sic*] account against Stevens' prior obligations[.]

11

*Id.* at 788. The *Community Bank* court clearly incorporated the defendant's ignorance into its analysis, limiting the effect of its holding to those circumstances where a receiving bank accepts and sets off funds "without knowledge of any mistake." Indeed, one court, relying on *Community Bank*, held that Article 4A did not squarely address a plaintiff's claim that a receiving bank accepted and set off wired funds when it knew or should have known the funds had been mistakenly transferred. *Consorcio*, 2012 WL 13019678, at *3. Accordingly, the Northern District of Texas held that the plaintiff was "free to bring claims against Defendant based on legal theories outside of [Article 4A]." The Bankruptcy Court of the Southern District of New York reached a consistent conclusion:

> Although Article 4A deals with a transfer of funds to an unintended beneficiary, *see* UCC § 4A–205(a), it does not appear to expressly address the transfer of funds to an intended beneficiary but to an account at the wrong bank. Moreover, the common law claims in the Complaint are not facially inconsistent with the provisions of Article 4A. As the Complaint has framed the matter, the question is whether HSBC learned of RBS' mistake prior to its asserted set-off of the funds against Awal Bank's debt. The question of notice is at the heart of the matter . . . [I]f HSBC set-off the Wire Transfer before learning of RBS' mistake, the Complaint appears to concede that the payment order was accepted for purposes of the UCC and [the] common law claims are preempted by Article 4A. If, however, HSBC had notice that the payment order had been cancelled before it accepted the payment and offset the funds against Awal Bank's indebtedness, then the payment order could not be accepted and the [] common law claims would not be preempted.

*In re Awal Bank, BSC*, 455 B.R. 73, 92-93 (Bankr. S.D.N.Y. 2011)

Joining these few courts who have confronted the precise question before us, albeit in slightly different variations,[7] we find that Article 4A does not squarely address BMO's allegations and thus does not preempt the common law claims presented.[8]

Having determined that Article 4A does not foreclose the relief sought by BMO Harris, we next address whether the Complaint adequately states a plausible claim for relief. Salin primarily criticizes BMO Harris's allegations for being based "upon information and belief." However, pleading "upon information and belief" is not fatal to a complaint so long as there is sufficient factual detail to support the inference of plausibility. *Green v. Beth*, 663 Fed. Appx. 471, 474 (7th Cir. 2016); *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 917, 2013 WL 2992163 (7th Cir. 2013). Here, BMO Harris has pled that Salin knew Midwest was experiencing financial problems, that Salin was not expecting significant deposits into Midwest's account because of Midwest's financial deterioration, and that Salin received BMO Harris's recall notice before setting off the

---

[7] Salin argues that *Consorcio* should not influence our analysis because it involved an entity-to-bank wire transfer rather than a bank-to-bank wire transfer. Salin fails to explain why this distinction is material at this juncture. Indeed, the root problem in *Consorcio* is comparable to that presented by BMO Harris in the Complaint: a bank refused to return funds it allegedly knew (or should have known) never should have been transferred to it. Moreover, the *Community Bank* court (Salin's purportedly pivotal case) implicitly recognized, in the context of a bank-to-bank transfer, that a receiving bank's knowledge of another bank's mistake could impede the receiving bank's right to retain the funds pursuant to Article 4A. For these reasons, we conclude that Salin's distinction is one without substance.

[8] Salin also asserts that BMO Harris's three common law cause of actions are specifically displaced by §§ 4A-202(a), 4A-209(b), and 4A-404. We disagree. None of these provisions plainly govern the issue contemplated in the Complaint: § 4A-202(a) only addresses authorized orders, which is uncontested here; § 4A-209(b) governs acceptance, but does not discuss the potential relevancy of a beneficiary bank's knowledge; and § 4A-404 discusses the obligations of beneficiary's bank upon acceptance, again, without determining how the beneficiary's knowledge of mistake could impact the analysis.

funds as a credit on Midwest's outstanding debt to Salin. These are not "threadbare recitations" but specific factual allegations that allow us to reasonably infer Salin's plausible culpability. Whether BMO Harris has sufficient evidence of Salin's knowledge at the time of its complained-of actions—on which the Complaint's capacity to live outside of Article 4A hinges—or whether BMO Harris can prevail on the merits of its common law claims are questions reserved for another day.[9]

Accordingly, we find that BMO Harris has sufficiently pled its claims, which are not preempted by the Uniform Commercial Code.

## CONCLUSION

For the reasons set forth herein, Defendant's Motion for Judgment on the Pleadings [Dkt. 23] is **denied.**

Date:   3/2/2020

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jacob V. Bradley
QUARLES & BRADY LLP (Indianapolis)
jacob.bradley@quarles.com

Darren Andrew Craig
FROST BROWN TODD LLC (Indianapolis)
dcraig@fbtlaw.com

---

[9] BMO Harris's invocation of the "discharge for value" rule inherently ventures into the merits of establishing who is entitled to the funds under common law principles. We thus refrain at this time from addressing if or how this rule applies to the facts presented.

14

Lucy Renee Dollens
QUARLES & BRADY LLP (Indianapolis)
lucy.dollens@quarles.com

William T. Repasky
FROST BROWN TODD LLC (Louisville)
brepasky@fbtlaw.com

Emily Schmale
FROST BROWN TODD LLC (Indianapolis)
eschmale@fbtlaw.com