UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BMO HARRIS BANK N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-03263-SEB-TAB |
| | ) | |
| SALIN BANK AND TRUST COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On October 23, 2018, Plaintiff BMO Harris Bank B.A. ("BMO Harris") initiated this diversity suit asserting state and common law claims for unjust enrichment (common law), conversion (common law), and replevin (state law). [Dkt. 1]. Now before the Court is Defendant Salin Bank and Trust's ("Salin") Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56. [Dkt. 42]. For the reasons set forth herein, we **grant** Salin's Motion for Summary Judgment.

## Background

We assume that it is not common in the field of banking for a bank to mistakenly transfer a large sum of money to another bank who happens to have its own legitimate claim to those funds. But that is precisely what the parties tell us happened here. The facts giving rise to this litigation explain how this situation occurred and, happily for our purposes, are straightforward and generally undisputed.

In November 2016, BMO Harris, a national banking organization, executed a loan agreement with its customer, North & Maple, LLC ("North & Maple"), for a construction

project, on which Midwest Form Constructors, LLC ("Midwest") served as the general contractor. [Dkt. 45, at 3; Dkt. 53, at 6]. Midwest maintained a bank account and borrowing relationship with Defendant Salin. [Dkt. 45, at 2; Dkt. 53, at 6].

At the direction of North & Maple, BMO Harris repeatedly funded advances from the North & Maple loan to Midwest's account at Salin for the benefit of North & Maple. [Dkt. 45, at 3; Dkt. 53, at 6]. The advances were to be used for the completion of North & Maple's construction project; they were not furnished for Midwest's individual benefit, debts, or other obligations. [Dkt. 53, at 6]. Notwithstanding the purpose of these advances, Midwest had granted to Salin the right to set off funds from Midwest's account if and when Midwest was in default under its lending contract with Salin. [Dkt. 45, at 2].

Sometime in the late-2016 or early-2017, Salin became aware that Midwest's financial condition was deteriorating which eventually led Midwest to "wind down business." [Dkt. 45, at 2; Dkt. 53, at 3]. Nonetheless, Midwest continued receiving wire transfers into its operating account at Salin, and it informed Salin that it should anticipate continued deposits into this account. [Dkt. 45, at 2-3].

On March 12, 2018, Midwest and North & Maple directed BMO Harris not to advance further loan proceeds to Midwest. Instead, BMO Harris was instructed to transfer all future proceeds to the agent of Midwest's bonding company, Atlas Funds Control, LLC ("Atlas") at a different bank. [Dkt. 53, at 6]. At all relevant times, Salin was neither aware of nor privy to this agreement between Midwest, North & Maple, and BMO Harris. [Dkt. 45, at 4].

On March 21, 2018, BMO Harris received directions from North & Maple to wire loan proceeds in the amount of $1,199,443.07 to Atlas. [Dkt. 53, at 6]. BMO Harris, utilizing the Federal Reserve Wire Transfer Network ("Fedwire"), initiated the wire transfer in the requested amount on March 23, 2018; however, it mistakenly wired the funds to Midwest's account at Salin. [Dkt. 53, at 6]. Salin's wire room received the incoming wire transfer through Fedwire on March 23, 2018 at 2:57 p.m. A representative of Salin utilized Salin's computerized core processor system to credit Midwest's account with the wire transfer proceeds, effective at 3:19 p.m. that same day. [Dkt. 45, at 4]. Prior to this wire transfer, seven other transfers originating from BMO Harris on behalf of North & Maple were also made to Midwest's account at Salin, totaling over $2,405,371.00.

The morning of the next business day, Monday, March 26, 2018, Salin's Vice President Workout Officer William Keeney reviewed Midwest's account and realized it had a positive balance resulting from the wire transfer proceeds. [Dkt. 45, at 4]. Mr. Keeney and John Frieburg, Salin's Executive Vice President Credit Officer, decided that Salin would set off the available funds in Midwest's account to partially pay down Midwest's indebtedness to Salin, pursuant to the contractual set-off authority granted to Salin by virtue of its lending relationship with Midwest. [Dkt. 45, at 4]. Consistent with this decision, Salin states that it had completed the set off by 12:08 p.m. on March 26,

2018, after withdrawing the funds in Midwest's account and placing them into an account managed by Salin.[1] [Dkt. 45, at 4; Dkt. 53, at 7].

At 5:04 p.m. on March 26, 2018, after realizing its mistake, BMO Harris issued an "urgent recall of funds" message via the Fedwire system. Salin received the message the following business day, Tuesday, March, 27, 2018.[2] [Dkt. 45, at 5; Dkt. 53, at 7], but Salin denied the request to return, informing BMO Harris that the funds were unavailable because the set-off had been completed the day before. [Dkt. 45, at 6]. The parties did not otherwise communicate regarding the wire transfer prior to the initiation of this litigation.

Though the parties generally do not contest this account of the sequence of events, BMO Harris maintains that a genuine issue of material fact exists with respect to whether Salin knew or should have known that the wire transfer was in error at the time it accepted the funds and completed its set-off. Salin denies having had any such knowledge.

On October 23, 2018, BMO Harris brought suit against Salin demanding the return of the funds inadvertently transferred on March 23, 2018 (the "Funds").

---

[1] BMO Harris counters that, while the "effective date" of the credit is March 26, 2018, this date may not reflect when the credit actually was established. Rather, BMO Harris asserts that Mr. Frieburg's deposition testimony indicates that the funds were physically credited at a later date but back-dated to March 26, 2018. Salin rejects this interpretation of Mr. Frieburg's testimony and asserts that there is no evidence indicating that the effective date inaccurately represents when the set-off occurred. As will be discussed herein, this dispute, which relates to Salin's knowledge at the time of the set-off, is immaterial to our holding, as are various other facts BMO Harris has advanced to argue that Salin knew the transfer was in error.

[2] Salin's statutorily-allowed daily cut-off time for its funds transfer business is 4:00 p.m. [Dkt. 45, at 5].

## Analysis

### I.      Standard of Review

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

### II.     Discussion

The parties agree that Indiana law governs the resolution of this dispute.

### A.  Article 4A of the UCC Does Not Preempt BMO Harris's Alleged State and Common Law Claims

Salin first argues that it is entitled to summary judgment on the grounds that Article 4A of Indiana's Uniform Commercial Code provides the exclusive source of rights and remedies for all financial institutions participating in the nation's wire transfer system. According to Salin, Article 4A—which favors Salin's retention of the Funds— preempts any and all state and common law claims related to the disputed wire transfer.

We need not engage in an exhaustive discussion of Salin's arguments on this issue as it previously was asserted as the basis for its Motion for Judgment on the Pleadings,

5

which we denied on March 2, 2020. [Dkt. 60]. In our Order denying Salin's request for

judgment on the pleadings, we conducted a thorough review of the limited body of case

law available to guide our decision on whether and to what extent Article 4A preempts

state and common law claims such as the ones presented here. We found guidance in the

general principles put forth by those courts, both within and outside our Circuit, whose

decisions we determined to be consistent with the provisions and purposes of Article 4A.

We wrote there:

> As the Southern District of New York explained, "[P]arties whose conflict arises
> out of a funds transfer should look first and foremost to Article 4A for guidance in
> bringing and resolving their claims[.]" *Sheerbonnet, Ltd. v. Am. Exp. Bank, Ltd.*,
> 951 F. Supp. 403, 407 (S.D.N.Y. 1995), *as amended* (May 1, 1996). If a situation
> is unequivocally covered by particular provisions in Article 4A, then it is beyond
> debate that Article 4A governs exclusively. *See id.*; *Fitts v. AmSouth Bank*, 917
> So. 2d 818, 824 (Ala. 2005). However, courts should not interpret this directive to
> mean that Article 4A has "completely eclipsed" the applicability of common law
> in the area of funds transfers. *Sheerbonnet*, 951 F. Supp. at 407 (Article 4A "does
> not establish a legislative intent to preclude any and all funds transfer actions not
> based on Article 4A"); *Regions Bank v. Provident Bank, Inc*., 345 F.3d 1267, 1275
> (11th Cir. 2003) (holding that Article 4A did not preempt common law claims
> when the UCC was "silent" as to the factual scenario alleged); *see also Cmty.*
> *Bank*, 966 F. Supp. at 788 (quoting *Sheerbonnet* with approval). Rather,
> preemption likely does not foreclose common law claims related to funds transfers
> when the disputed "conduct or factual scenario is not addressed squarely by the
> provisions of [Article 4A]." *Consorcio*, 2012 WL 13019678, at *3; *Regions*, 345
> F. 3d at 1275.
>
> The standards espoused in these cases accurately reflect the legislative intent of
> Article 4A such that Article 4A clearly does place restraints on plaintiffs like
> BMO Harris but only when they resort to principles of law or equity outside of
> Article 4A to establish rights, duties, or liabilities that are plainly contemplated by,
> and thus inconsistent with, the provisions therein. Accordingly, we reject Salin's
> contention that Article 4A "provides the exclusive source of rights and remedies
> for all financial institutions participating in the nation's wire transfer system," no
> matter the factual circumstances. Instead, in deciding whether BMO Harris's
> common law claims are preempted by the UCC, we must determine whether the

allegations in the Complaint are "squarely" contemplated by Article 4A. *Consorcio*, 2012 WL 13019678, at *3.

[Dkt. 60, at 9-10]. As BMO Harris has argued, its claims—which are premised on a beneficiary bank accepting wired funds with the actual or constructive knowledge that the transfer was done in error—are not squarely contemplated by Article 4A. We agreed in our prior order, finding BMO Harris's position to be consistent with those few courts who had confronted this precise question. [*Id.* at 13]. We noted, however, that "[w]hether BMO Harris has sufficient evidence of Salin's knowledge at the time of its complained-of actions—on which the Complaint's capacity to live outside of Article 4A hinges—or whether BMO Harris can prevail on the merits of its common law claims are questions reserved for another day." [*Id.* at 14].

That day has now come.  Even so, we need not address whether Salin acted with actual or constructive knowledge at the time of the complained-of actions; even if Salin had been fully apprised that the wire transfer was in error at the time it accepted and set off the Funds, Salin is entitled to summary judgment on the claims brought against it.

B.  BMO Harris's State and Common Law Claims Fail as a Matter of Law

At the heart of the parties' dispute on the merits is the issue of whether BMO Harris can succeed in establishing any right to restitution of the Funds, which did not belong to BMO Harris but to its customer, North & Maple. Even if BMO Harris's Complaint is not preempted by Article 4A, Salin insists that each cause of action is defeated by the fact that BMO Harris, who was not the owner of the Funds, does not qualify as a "real party in interest."

Salin first addresses BMO Harris's claim of replevin. [Dkt. 45, 17-18]. In Indiana, replevin is a "statutory remedy designed to allow one to recover possession of property wrongfully held or detained as well as any damages incidental to the detention." *Dawson v. Fifth Third Bank*, 965 N.E.2d 730, 735 (Ind. Ct. App. 2012). *See also* Ind. Code § 32–35–2–1 (providing that where property is wrongfully taken or unlawfully detained from the owner or person claiming possession of the property, the owner or claimant may bring an action for possession of the property). To succeed on a claim for replevin under Indiana law, the plaintiff must establish three elements: title or right to possession, unlawful detention, and the defendant's wrongful possession. *Shanehsaz v. Johnson*, 259 F. Supp. 3d 894, 899, 2017 WL 1354849 (S.D. Ind. 2017). "The plaintiff must prove his right to possession on the strength of his own title, not merely the weakness of the defendant's title or right to possession." *Id.* (quoting *United Farm Family Mut. Ins. Co. v. Michalski,* 814 N.E.2d 1060, 1066 (Ind. Ct. App. 2004)).

Here, BMO Harris's replevin claim, as pled in its Complaint, is based on allegations that it mistakenly wired the Funds to Midwest's account at Salin, and that Salin knew or should have known it had an obligation to return these Funds to BMO Harris. [Compl. ¶¶ 22-24]. Salin argues that BMO Harris cannot establish the first element of replevin, that is, title to or right to possession of the Funds. As Salin explains, BMO Harris did not hold title to these Funds, which belonged exclusively to North & Maple until transferred to and accepted by Salin and then deposited into Midwest's account.[Dkt. 45, at 17]. Thus, argues Salin, BMO Harris's replevin claim cannot survive summary judgment.

BMO Harris does not dispute that the Funds erroneously transferred were owned exclusively by North & Maple at the time of the wire transfer. Rather, for the first time, BMO Harris asserts that it is seeking recovery not of the funds wired on March 23, 2018, but of funds it subsequently transferred to Atlas, Midwest's funds control agent. Specifically, BMO Harris now reveals in the course of its briefing in response to the motion for summary judgement that it issued a subsequent wire transfer, consisting of its own funds, to Atlas in an amount matching that of the inadvertent wire transfer. "It is these funds  . . . that it now seeks to recover here," BMO Harris states. [Dkt. 53, at 19]. Because this subsequent transfer consisted of its own funds, BMO Harris declares that it is "indisputably" a real party in interest, though it offers no legal authorities explaining how this is so. [*Id.*].

In quick rejoinder, Salin asserts that BMO Harris's contention is flawed on several grounds. [Dkt. 54, at 10-12]. First, BMO Harris's Complaint never alleges that it issued a subsequent wire transfer, nor does BMO Harris plead that it was seeking to recover the funds transferred in this subsequent wire transfer. Rather, the Complaint carefully tethered each cause of action to the recovery of the funds that were mistakenly wired on March 23, 2018. Additionally, says Salin, BMO Harris never produced any records memorializing this subsequent transfer, though such records would surely have been responsive to Salin's discovery requests. Moreover, BMO Harris cannot maintain a claim for replevin based on subsequently transferred funds that Salin has never detained nor possessed.

We agree with Salin on this issue, for several reasons, beginning with the fact that BMO Harris's Complaint obviously does not contain any factual allegations related to a subsequent transfer of funds. As Salin has aptly summarized, BMO Harris's Complaint is *entirely* based on its desire to recover the funds it inadvertently transferred and *not* some other transferred funds that BMO Harris has (suspiciously) omitted mention of (and apparently any discovery related thereto) until now. BMO Harris cannot use summary judgment briefing to recast its claims against Salin. *See Smith v. Union Pac. R. Co.,* 474 Fed. Appx. 478, 480 (7th Cir. 2012) (holding that the district court correctly disregarded the plaintiff's argument raised in responsive briefing "because it differ[ed] from the account he pleaded, and he may not amend his complaint through the filing of a response brief"); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011) (finding that plaintiff's efforts to present alternative claims for relief in response to a motion to dismiss "founder[ed] . . . because of the axiomatic rule that a plaintiff may not amend his complaint in his response brief.")

Even if BMO Harris's replevin claim was based on the recovery of the funds subsequently wired to Atlas, it would still be unavailing. Replevin affords a remedy to those whose property is wrongfully detained by another. But here, Salin has not detained nor possessed the funds that BMO Harris now asserts it is seeking to recover, and BMO Harris has implicitly conceded that it did not have title to the funds initially transferred and retained by Salin.[3] Unresolved by BMO Harris are fundamental questions, such as:

---

[3] As already noted, BMO Harris never disputes Salin's averment that the Funds were not BMO Harris's property "before, during, or after" the initial wire transfer. BMO Harris has conceded the

how can Salin be wrongfully withholding funds that it never possessed, and why should BMO Harris be entitled to recover money that did not belong to it?[4] Rather than confront the shortcomings of its case against Salin, BMO Harris boldly asserts that the "subsequent wire transfer defeats Salin's argument[s],"[5] without designating any case law supporting a claim for replevin in these circumstances or otherwise addressing how its new theory comports with the elements of replevin.[6]  Again, BMO Harris reverts to its assertion that there is a question of fact as to whether Salin's detention of the Funds was wrongful—but, as has now been made clear, these are not the funds for which BMO Harris seeks restitution.

---

validity of Salin's arguments on this point by failing to respond. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). BMO Harris relegates its discussion on this issue to a conclusory statement that its subsequent wire transfer entitles it to possess the Funds, but it sidesteps offering any legal authorities or analysis explaining how this is so.

[4] BMO Harris has not cited, nor are we aware of, any cases where a bank that has erroneously transferred its client's funds has prevailed (or survived summary judgment) on claims seeking restitution absent an identifiable ownership or possessory interest in the funds, except in circumstances not presented here where the UCC explicitly authorizes the transferor bank to seek restitution. *See In re Calumet Farm, Inc.*, 398 F.3d 555, 559 (6th Cir. 2005) ("[Section 4A-303(a)] authorizes a bank to seek restitution from the beneficiary of the excess payment if the bank committed an error in executing the payment order."); *Qatar Nat. Bank v. Winmar*, Inc., 650 F. Supp. 2d 1, 7 (D.D.C. 2009) ("According to these Regulations, also known as 'Regulation J,' a bank that mistakenly issues a duplicate order is 'entitled to recover from the beneficiary of the erroneous order the excess payment received to the extent allowed by the law governing mistake and restitution.'")

[5] In its discussion of conversion, BMO Harris ever so subtly alludes to being a subrogee of its client but omits from its briefing any explicit or cogent argument to that effect. Moreover, it is unclear how the doctrine of subrogation, which "arises from the discharge of a debt and permits the party paying off a creditor to succeed to the credit's rights in relation to the debt," is applicable here. *Bank of New York v. Nally*, 820 N.E.2d 644, 651 (Ind. 2005). And, as Salin notes, "there is no evidence before the Court that North & Maple assigned any claim to the Funds it may have to BMO Harris."

[6] BMO Harris also states, again without citation to any legal authorities, that there is a "genuine issue of material fact as to whether BMO Harris's right to the funds at issue is superior to Salin," necessitating a trial on the replevin cause of action.  But this argument lacks any support in the form of an explanation of *what* right BMO Harris actually possesses in or to the Funds.

BMO Harris's claim for civil conversion is similarly problematic. To prevail on this cause of action, BMO Harris must show that Salin knowingly and intentionally exerted unauthorized control over BMO Harris's property. *JET Credit Union v. Loudermilk*, 879 N.E.2d 594, 597 (Ind. Ct. App. 2008). In its Complaint, BMO Harris alleges that Salin committed conversion when it knowingly exerted unauthorized control over the inadvertently transferred funds. But the funds transferred to and retained by Salin were not BMO Harris's property, Salin emphasizes again, mirroring the allegations actually pled in the Complaint.

BMO Harris again advances its previously undisclosed averment in arguing that its subsequent funds transfer has placed its own property at issue. Assuming *arguendo* that this variation from what was specifically alleged in Complaint is a permissible basis on which to attempt to defeat summary judgment, BMO Harris still has not provided an explanation. BMO Harris continues to ignore the fact that Salin has not maintained any control over the funds it seeks to recover, i.e., those funds it wired to Atlas. BMO Harris's attempts to create a question of fact over whether Salin "knowingly" exerted unauthorized control over North & Maple's funds disregard this reality. [Dkt. 53, at 17-18]. Under no version of the uncontroverted facts can BMO Harris establish this essential element of its claim for conversion. Salin is thus entitled to summary judgment on the conversion theory of liability.

Finally, we turn to BMO Harris's unjust enrichment claim. "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Zoeller v. E. Chicago Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009). "To

12

prevail on a claim of unjust enrichment, a claimant must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Id.* Additionally, "a plaintiff must generally show that he rendered a benefit to the defendant at the defendant's express or implied request[.]" *Reed v. Reid*, 980 N.E.2d 277, 296 (Ind. 2012).

BMO Harris's Complaint alleges that by mistakenly sending the wire transfer to Salin, it conferred upon Salin a measurable benefit in the amount of the wired funds. As with the other causes of actions, Salin first argues that BMO Harris has not rendered a measurable benefit to Salin because the Funds belonged to North & Maple, not BMO Harris. Additionally, says Salin, it never requested the bestowal of this benefit by BMO Harris. BMO Harris repeats the factual sequence in response to Salin's argument saying that it (BMO Harris) effectuated the erroneous wire transfer, that Salin accepted the Funds though it should have recognized the error, and that BMO Harris issued a subsequent wire transfer in the same amount to Atlas. Thus, argues BMO Harris, it would be unjust for Salin to retain the benefit of the initial, erroneous wire transfer. Salin counters again that it has received no measurable benefit from the funds that BMO Harris unilaterally decided to transfer to Atlas.

Salin's reasoning is solid. BMO Harris has belatedly made clear in its summary judgment briefing that it is seeking to recover the second transfer of funds, those that it transferred to Atlas, not the funds transferred on March 23, 2018. Notwithstanding the procedural misstep in advancing an argument never pled in the Complaint, there is simply no indication that Salin received a measurable benefit from this subsequent transfer. And,

while BMO Harris may have decided to make North & Maple whole in what presumably was an attempt to mitigate its own liability, it apparently did not anticipate how this course of conduct would undermine any potential claim against Salin for unjust enrichment.  The cornerstone principles of restitution in the context of unjust enrichment is the restoration of a party who, at its expense, conferred a benefit to another. *See* Restatement (First) of Restitution § 1 Unjust Enrichment (1937), comment a.[7] BMO Harris's initial wire transfer benefitted Salin at the expense of North & Maple; it therefore was North & Maple who would have been entitled to restoration.  Further, BMO Harris has provided no response to Salin's argument that it never requested the benefit conferred,[8]  which silence we take as a concession. Accordingly, BMO Harris's unjust enrichment claim against Salin fails.

BMO Harris has thus failed to overcome Salin's legal arguments based on its lack of evidence supporting the essential elements of its claims. While BMO Harris maintains that there are genuine issues of material fact with respect to Salin's knowledge, "there can be no genuine issue of material fact [where] a complete failure of proof concerning an

---

[7] The Restatement (First) of Restitution § 1 and its commentary are routinely applied affirmatively by Indiana courts. *See generally  Zoeller*, 904 N.E.2d at 220; *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991); *Ralph L. Shirmeyer, Inc. v. Indiana Revenue Bd.,* 229 Ind. 586, 595, 99 N.E.2d 847, 851 (1951); *St. Mary's Med. Ctr., Inc. v. United Farm Bureau Family Life Ins*. Co., 624 N.E.2d 939, 941 (Ind. Ct. App. 1993).

[8] Some exception does exist to this general rule requiring that the benefit be at the beneficiary's request. For example, a plaintiff may prevail on an unjust enrichment claim where a third party has conferred a benefit on the defendant in respect of property that belonged to the plaintiff without the defendant having had requested the benefit.  *BloomBank v. United Fid. Bank F.S.B*., 113 N.E.3d 708, 729 (Ind. Ct. App. 2018), trans. denied, 123 N.E.3d 129 (Ind. 2019) (collecting cases). However, BMO Harris has not argued that such circumstances exist here nor could it. If anything, this line of cases would enable North & Maple to bring an unjust enrichment against Salin, even though Salin had not requested the benefit.

essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (internal quotations omitted).

C. The "Discharge for Value" Rule Does Not Save BMO Harris's Claims

Though it does not breathe life into its failed claims, for the sake of thoroughness, we shall address BMO Harris's insistence that a concept known as the "discharge for value" rule entitles it to repayment of the Funds, or at least gives its claims enough viability to survive summary judgment.

The discharge for value rule originates from section 14 of the Restatement (First) of Restitution (1937), which sets out:

> A creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

In its simplest terms, the discharge for value rule (sometimes regarded as the innocent third party creditor exception) allows a creditor to escape restitution where he has mistakenly received funds that discharged a debt owed to him so long as he was unaware of the transferor's error. *Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189, 192 (N.Y. 1991). *See also Gen. Elec. Capital Corp. v. Cent. Bank*, 49 F.3d 280, 284 (7th Cir. 1995). The rule provides an equitable exception to common law rules allowing for restitution in order to place the loss "on the [party] who created the situation and was in the best position to avoid it." *Lincoln Nat. Life Ins. Co. v. Brown Sch., Inc*., 757 S.W.2d 411, 415 (Tex. App. 1988); *see also St. Mary's Med. Ctr., Inc. v. United Farm Bureau*

*Family Life Ins. Co.*, 624 N.E.2d 939, 945 (Ind. Ct. App. 1993) (holding that innocent third party creditors are not unjustly enriched and thus need not pay restitution).

BMO Harris asserts that those courts that have addressed the issues presented here have applied the discharge for value rule to determine who is entitled to funds mistakenly transferred. Pursuant to this rule, BMO Harris maintains that the Funds "must be returned to it if Salin knew or should have known that BMO Harris sent the wire in error." [Dkt. 53, at 13].

As a preliminary matter, BMO Harris's summarization of its proffered case law misstates the actual holdings of those cases. Several of the cases cited by BMO Harris hold merely that common law causes of action may be pursued when Article 4A is silent as to how factual circumstances, such as those present here, should be resolved. *See Regions Bank,* 345 F.3d at 1279; *Consorcio*, 2012 WL 13019678, at *4 (N.D. Tex. July 12, 2012); *Sheerbonnet, Ltd. v. Am. Exp. Bank, Ltd.*, 951 F. Supp. at 410; *Schlegel v. Bank of Am*, 628 S.E. 2d 362 (Va. 2006). Many of BMO Harris's cases do not address the discharge for value rule at all, *see Regions Bank*, 345 F.3d at 1279; *Consorcio*, 2012 WL 13019678, at *4; *Schlegel*, 628 S.E. 2d at 362, while others acknowledge the rule's existence but stop short of actually applying it. *Sheerbonnet,* 951 F. Supp. at 410; *In re Awal Bank*, 455 BR 73, 93 (Bankr. S.D.N.Y. 2011). Clearly, these cases do not establish that the knowledge of the recipient is determinative of who is entitled to mistakenly transferred funds. Rather, these cases teach that the Court must look to the relevant jurisdiction's principles of restitution when adjudicating disputes such as the one before us.

Moreover, a careful review of those few cases in which courts have affirmed or applied the discharge for value rule discloses that they do not support the application of that rule here in the manner requested by BMO Harris.  In fact, what BMO Harris requests is in contravention of the rule properly interpreted and applied.[9]

At its core, the discharge for value rule is widely regarded and most easily applied as an affirmative defense, presupposing the validity of the claimant's causes of action.[10] *In re Calumet Farm, Inc.*, 398 F.3d 555 (6th Cir. 2005); *Banca Commerciale Italiana, New York Branch v. N. Tr. Int'l Banking Corp.*, 160 F.3d 90, 94 (2d Cir. 1998); *Qatar Nat. Bank v. Winmar, Inc.*, 650 F. Supp. 2d 1, 8 (D.D.C. 2009); *NBase Commc'ns, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago,* 8 F. Supp. 2d 1071, 1073 (N.D. Ill. 1998); *In re Awal Bank*, BSC, 455 B.R. at 93; *Credit Lyonnais New York Branch v. Koval*, 745 So. 2d 837, 839 (Miss. 1999).[11]

In all cases identified by the parties as borne out by the Court's own research, it is a doctrine that may be invoked by the creditor/transferee to rebut restitution.  *See generally id.; See also Gen. Elec. Capital Corp. v. Cent. Bank*, 49 F.3d at 280; *Banque Worms*, 570 N.E.2d at 189; *St. Mary's Med. Ctr., Inc.*, 624 N.E.2d at 941(holding that the

---

[9] The parties dispute whether Indiana has adopted (or would adopt) the discharge for value in the context of wire transfers. For the sake of argument only, we assume that the Indiana Supreme Court would apply the discharge for value rule to wire transfers if presented with the opportunity.

[10] The most updated restatement classifies it as a defense. Restatement (Third) of Restitution § 67 (2019).

[11] In less common scenarios, creditors have successfully invoked the discharge for value rule when they have mistakenly received funds to which they are entitled, but where the bank managing their accounts reverses the error without the creditor's consent. Such is not the case here. *See Gen. Elec. Capital Corp.*, 49 F.3d at 282; *Banque Worms*, 570 N.E.2d at 189.

innocent third party creditor doctrine served as exception to common law rule of restitution in mistake of fact cases).  Relevant case law simply does not support applying the rule as a stand-alone determinative rule, as BMO Harris seeks to do here. Indeed, its averment that the Funds "must be returned if Salin knew or should have known that BMO Harris sent the wire transfer in error" reverses the actual rule, which would relieve Salin of any duty otherwise imposed upon it by common law to return the funds if it did not know of the error. This distinction may seem slight, but its impact is significant. By way of example, if the discharge for value rule were applied here in accordance with BMO Harris's view, a party could receive restitution regardless of whether and to what degree its claims flounder on the merits. In contrast, properly applied,  the rule here would be invoked at the behest of Salin, who, if facing meritorious replevin or unjust enrichment or conversion claims against it, could attempt to resist restitution by invoking the discharge for value defense. Of course, Salin is not required to avail itself of the benefits of this rule when BMO Harris's claims fail on their merits.

   D.   <u>Salin's Internal Procedures Do Not Give Rise to a Cause of Action</u>

      Before concluding our legal analysis, we shall address the final contention by BMO Harris, that is, that Salin failed to follow its internal protocols related to wire transfers when it accepted the Funds. BMO Harris maintains that Salin's internal procedures require that the beneficiary's name match the account number in the wire transmittal; otherwise, the funds should be returned. Because the wire transfer at issue identified North & Maple as the beneficiary, while the account number was that for Midwest, the Funds should not have been accepted, says BMO Harris. This argument

18

requires little by way of discussion by us.  BMO Harris has anchored this theory to no cited legal authorities. In addition to its other arguments, Salin has correctly argued that its internal policies do not give rise to any independent cause of action against it. *Interactive Intelligence, Inc. v. KeyCorp*, 2007 WL 3171438, at *2 (S.D. Ind. Oct. 26, 2007), *aff'd,* 546 F.3d 897, 2008 WL 4682516 (7th Cir. 2008) ("A company's manual does not create a separate standard of care . . .  This is not the law.").  We agree.  No relief flows to BMO Harris based on this theory.

E. <u>Attorney's Fees</u>

Salin briefly asserts that it is entitled to attorney's fees pursuant to Ind. Code § 34-52-1-1, which permits the Court to award costs and fees to the prevailing party if the losing party brought a claim or defense that was frivolous, unreasonable, or groundless. The bases for fees contemplated in this statute—frivolity, unreasonableness, and groundlessness—denote distinct grounds by which a party may seek fees, each of which comes with its own standard of review. However, Salin has not identified the specific basis on which it seeks attorney's fees, even though such identification (and accompanying argumentation) is required for the Court to determine whether an award of fees is appropriate here. *See Staff Source, LLC v. Wallace*, 2020 WL 1233697, at *9 (Ind. Ct. App. Mar. 13, 2020); *Campbell v. Fed. Home Loan Mortgage Corp.*, No. 1:07–cv–1428–TAB–LJM, 2009 WL 395207, at *6 (S.D. Ind. Feb. 13, 2009) (nothing that standard for recovery of attorney's fees under § 34-52-1-1 is "high," and "[t]he fact that Plaintiffs' arguments against these Defendants failed, or even were not particularly persuasive, does not mean that an award of fees is appropriate."). Additionally, Federal

19

Rule of Civil Procedure 54(d)(2) and our Local Rule 54-1(a) require a request for attorney's fees to be made by motion after judgment. *Tovar Snow Professionals v. All Seasons Gen. Contracting, LLC*, No. 1:15-cv-00200-DML-TWP 2017 WL 2960267, at *11 (S.D. Ind. July 11, 2017). Accordingly, we deny Salin's request for attorney's fees at this time.

## **CONCLUSION**

Defendant's Motion for Summary Judgment [Dkt. 42] is **granted.** Defendant's request for attorney's fees is denied without prejudice to its refiling in proper form within 30 days following the entry of this order.  Final judgment shall enter by separate document at a subsequent date, depending on the resolution of the attorney fees request.

IT IS SO ORDERED.

Date:    5/21/2020

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jacob V. Bradley
QUARLES & BRADY LLP (Indianapolis)
jacob.bradley@quarles.com

Darren Andrew Craig
FROST BROWN TODD LLC (Indianapolis)
dcraig@fbtlaw.com

Lucy Renee Dollens
QUARLES & BRADY LLP (Indianapolis)
lucy.dollens@quarles.com

William T. Repasky
FROST BROWN TODD LLC (Louisville)
brepasky@fbtlaw.com

Emily Schmale
FROST BROWN TODD LLC (Indianapolis)
eschmale@fbtlaw.com